IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LESTER DOBBEY, ) | |
| JOSEPH DOLE, ) | |
| RAUL DORADO, ) | |
| BENARD MCKINLEY, and ) | |
| EUGENE ROSS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 19 CV 3272 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| ROB JEFFREYS, ) | |
| Director, Illinois Department of Corrections, ) | |
| in his official capacity, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| GLADYSE TAYLOR, ) | |
| DARWIN WILLIAMS, ) | |
| WALTER NICHOLSON, and ) | |
| MARCUS HARDY, ) | |
| in their individual capacities, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Lester Dobbey, Joseph Dole, Raul Dorado, Benard McKinley, and Eugene Ross are serving long sentences at Stateville Correctional Center, Illinois. Plaintiffs allege that they were members of a debate class established by Stateville. The members of the class allegedly advocated for reinstating a parole system in Illinois, culminating in a debate attended by journalists, state legislators, and other members of the public. Prison officials allegedly canceled

the debate class and retaliated against plaintiffs. The prison officials did so, plaintiffs allege, solely because they did not approve of plaintiffs' opinions about parole.

Plaintiffs sued the prison officials under 42 U.S.C. § 1983, which provides a remedy to people deprived of their constitutional rights. Plaintiffs claim that: (Count I) canceling the debate class violated their rights under the First Amendment; (Count II) defendants retaliated against plaintiffs for expressing their opinions about parole; (Count III) defendants conspired to cancel the class and to retaliate against plaintiffs; and (Count IV) defendants failed to intervene to prevent the violation of plaintiffs' rights. Plaintiffs seek damages and reinstatement of the debate class. They also seek a preliminary injunction, for which this court has scheduled an evidentiary hearing and a pre-hearing conference.

Defendants move to dismiss. The court dismisses the failure to intervene claim against Gladyse Taylor. The motion is otherwise denied.

## BACKGROUND

Because defendants challenge the legal sufficiency of plaintiff's claims, plaintiff's allegations are taken as true. Gibson v. Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).

Plaintiffs allege that on March 21, 2018, journalists, members of the Illinois Prisoner Review Board, officials from the Illinois Department of Corrections, and eighteen members of the Illinois General Assembly went to Stateville Correctional Center and listened to plaintiffs advocate for instituting a parole system in Illinois. Lester Dobbey talked about how he dropped out of high school before going to prison and re-teaching himself to read and write. Benard McKinley argued that people serving life sentences ought to one day have a chance of going home. Joseph Dole, a co-founder of an advocacy organization called Parole Illinois, argued that prosecutors should not serve on parole boards or play a significant role in parole decisions.

2

Eugene Ross, the other co-founder of Parole Illinois, argued that a parole system would ensure public safety and save taxpayer money. Raul Dorado, a member of parole Illinois, said that parole would encourage prisoners to focus on self-improvement.

Plaintiffs allege that the members of the Illinois General Assembly took their views seriously. They spent time with plaintiffs after the debate, asking questions and discussing the proposed policies. Plaintiffs—along with other students of the Stateville debate class responsible for planning and hosting the debate—planned to re-create the debate for other prisoners. The Department of Corrections approved that debate and agreed for it to be recorded.

The debate never happened. Three weeks before it would have taken place, defendant Gladyse Taylor—the Assistant Director of the Department of Corrections—allegedly appeared unannounced at a regularly scheduled debate class. With her were defendants Darwin Williams, Walter Nicholson, and Marcus Hardy, all employees of the Department of Corrections. Williams, Nicholson, and Hardy allegedly stayed silent as Taylor:

- said that she did not approve of plaintiffs communicating with Illinois legislators about parole;
- said that plaintiffs' advocacy interfered with the legislative agenda of the Illinois Department of Corrections;
- said that Illinois legislators needed to focus on appropriations for the Department of Corrections, not on parole;
- said that she talked to the legislators at the debate and told one of them that they should not introduce legislation without hearing the Department of Corrections' perspective;
- questioned whether plaintiffs were "appropriately placed" at Stateville, insinuating that they could be transferred to prisons farther from their families, with fewer opportunities for education or other program; and
- warned plaintiffs, "I better not see my name in any lawsuits."

The scheduled debate was canceled. So was the debate class. And the teacher of the class—Katrina Burlet, an accomplished competitive debater—was allegedly banned from entering any Department of Corrections facility for any purpose.

Plaintiffs filed grievances. They kept advocating for reinstating parole in Illinois. Members of the class sent a letter to the governor asking him to reinstate the class, which received significant media and public attention. Defendants allegedly retaliated. Dole submitted paperwork to add Burlet to his list of approved visitors, but unnamed defendants allegedly prevented him from doing so. McKinley, who had been admitted to a bachelor's degree program offered at Stateville by Northwestern University, was blacklisted from the program—again, by unnamed defendants—until a lawyer intervened for him. Unnamed defendants also allegedly:

- interfered with plaintiffs' placements in educational programs;
- issued disciplinary tickets without justification;
- interfered with plaintiffs' mail;
- interfered with their phone access;
- searched their property without justification;
- seized their property without justification;
- searched their bodies without justification; and
- placed them in solitary confinement without justification.

This suit followed.

## **DISCUSSION**

The complaint names the former director of the Illinois Department of Corrections, John Baldwin, as a defendant in his official and individual capacities. After discussing with the parties, the court removed Baldwin and substituted the current director, Rob Jeffreys (Doc. 18). In their response to defendants' motion to dismiss, plaintiffs name Jeffreys only in his official capacity. The court thus considers any individual capacity claims against Jeffreys voluntarily dismissed.

Plaintiffs bring a First Amendment claim against Jeffreys in his official capacity and against the individual defendants—Taylor, Williams, Nicholson, and Marcus Hardy—in their individual capacities. Plaintiffs also bring claims against the individual defendants for First Amendment retaliation, conspiracy, and failure to intervene. Defendants move to dismiss.

## 1  First Amendment violation

First, defendants argue that: (1) plaintiffs fail to state First Amendment claims; and (2) any such claims are barred by qualified immunity.

### 1.1  Failure to state a claim

To avoid dismissal, a plaintiff's claim must be plausible. A claim is plausible if the court, taking the alleged facts as true, can reasonably infer that defendants are liable. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Plaintiffs state First Amendment claims against Jeffreys in his official capacity and against Taylor, Williams, Nicholson, and Hardy in their individual capacities. A prison may not restrict speech based solely on the viewpoint expressed. See Thornburgh v. Abbott, 490 U.S. 401, 415 (1989) ("[A prison's] regulation or practice in question must further . . . [a] governmental interest unrelated to the suppression of expression."), quoting Procunier v. Martinez, 416 U.S. 396, 413 (1974); Pell v. Procunier, 417 U.S. 817, 828 (1974) ("So long as this restriction operates in a neutral fashion, without regard to the content of the expression, it . . . does not abridge any First Amendment freedoms retained by prison inmates."); Turner v. Safley, 482 U.S. 78, 89–90 (1987) ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."). Taylor, with the other individual defendants present, allegedly told plaintiffs that she did not approve of plaintiffs communicating with Illinois legislators about parole and

5

said that Illinois legislators needed to focus on appropriations for the Department of Corrections, not on parole. Those allegations raise an inference that defendants canceled the debate class and retaliated against plaintiffs solely because they disagreed with the content of plaintiffs' speech—their advocacy for reinstating parole in Illinois.

Because the allegations raise an inference that defendants' acts of cancelation and retaliation "impinge[d]" on plaintiffs' First Amendment rights, defendants must show that their acts were "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89 (establishing a four-factor test). Defendants offer no serious argument that canceling the debate class was reasonably related to legitimate penological interests. They baldly demand "substantial deference to the expert judgment of prison officials on the management of security restrictions," without identifying how letting prisoners debate the niceties of criminal justice policy would affect prison security. Consequently, defendants' conclusory invocation of the government's legitimate interest in security fails to show that canceling the debate class was reasonably related to penological interests.

The court need not consider, at the pleading stage of this case, the other Turner factors given defendants' utter failure to assert any logical connection between canceling the debate class and their vaguely-articulated security concerns. Id. at 89–90 ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."). Defendants are, of course, correct that prisoners have no right to a debate class. But Stateville decided to provide one, and it did so for six months—apparently without incident. Having done so, Stateville may neither cancel the debate class solely because it disagrees with the viewpoints expressed nor retaliate against prisoners for expressing those viewpoints. Cf. Mt. Healthy City School District Board of Education v. Doyle,

6

429 U.S. 274, 283 (1977) (holding that even though an untenured teacher "could have been discharged for no reason whatever . . . , he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms"); Plyler v. Doe, 457 U.S. 202, 223, 230 (1982) (holding that even though education is not a "fundamental right," a law authorizing public schools to deny enrollment to children not legally admitted to the United States violated the Equal Protection Clause).

Plaintiffs also sufficiently allege that the individual defendants were personally involved. Taylor allegedly showed up at what would be the last debate class meeting, dissuading plaintiffs from talking to state legislators, insinuating that plaintiffs could be transferred away from their families to remote prisons with inferior programming, and warning plaintiffs that she "better not see [her] name in any lawsuits." Williams, Nicholson, and Hardy allegedly came to the meeting with Taylor and remained silent, raising an inference that, (1) they coordinated with Taylor, and (2) Taylor spoke on their behalf.

All that allegedly happened on April 3, 2018. The scheduled debate and debate class were canceled soon after—no later than April 26, 2018, the day of the scheduled debate. That close timing raises an inference that the individual defendants participated in the decision to cancel the scheduled debate and debate class. It also raises an inference that the individual defendants caused the alleged retaliatory acts. See Magyar v. Saint Joseph Regional Medical Center, 544 F.3d 766, 772 (7th Cir. 2008) (reversing summary judgment for an employer on a Title VII retaliation claim, noting that, "Suspicious timing, together with other facts, can sometimes raise an inference of a causal connection."); Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979) ("[T]he question whether an agreement exists should not be taken from the jury in a civil

7

conspiracy case so long as there is a possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds . . . .") (alteration and quotation marks omitted), reversed in part on other grounds, 446 U.S. 754 (1980).

### 1.2 Qualified immunity

The individual defendants argue in the alternative that they are entitled to qualified immunity. Their perfunctory argument comprises a single sentence: "[T]here is no clearly established right to a debate class in prison and there is no law holding that prison officials violate inmates' First Amendment rights by canceling a debate class." The individual defendants repeat that superficial argument in urging the court to dismiss plaintiffs' First Amendment retaliation claims.

The individual defendants' boilerplate argument misconstrues qualified immunity doctrine. A police officer who shoots an unresisting, handcuffed arrestee in the back is not entitled to qualified immunity, even if no judicial opinion forbade that officer from doing so using a black Smith & Wesson M&P 9mm on State Street at 1:03 a.m., under the light of a full moon. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (holding that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question" and can thus give officials "notice that their conduct violates established law even in novel factual circumstances.").

As alleged in the complaint, the individual defendants had clear notice that their acts violated the First Amendment. See Turner, 482 U.S. at 89–90; Bridges v. Gilbert, 557 F.3d 541, 546–53 (7th Cir. 2009) (recognizing that prisoners retain the right to participate in activities protected by the First Amendment without fear of retaliation, so long as those activities are not inconsistent with legitimate penological interests). But the court need not discuss defendants'

single-sentence qualified immunity defense further—it is waived. See United States v. Cisneros, 846 F.3d 972, 978 (7th Cir. 2017) ("We have repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (quotation marks omitted).

**2      First Amendment retaliation**

Next, defendants move to dismiss plaintiffs' claims for First Amendment retaliation. Prison officials may not retaliate against prisoners for engaging in activities protected by the First Amendment. Bridges, 557 F.3d at 546. A prison official violates a prisoner's First Amendment rights when: (1) the prisoner engages in a protected activity not inconsistent with legitimate penological interests; (2) the official inflicts a deprivation likely to deter protected activity; and (3) the prisoner's protected activity was at least a factor motivating the deprivation. Id. at 546, 551, citing Turner, 482 U.S. at 89.

Taylor, Williams, Nicholson, and Hardy, the individual defendants, offer four arguments for dismissal: (1) they are entitled to qualified immunity; (2) prisoners have no First Amendment right to a debate class; (3) plaintiffs fail to allege that the individual defendants personally violated plaintiffs' rights; and (4) because plaintiffs continued to advocate for parole in Illinois, they were not deterred from engaging in First Amendment-protected activity.

Plaintiffs state First Amendment retaliation claims against the individual defendants. As discussed, the individual defendants' first three arguments are unpersuasive. They have waived their qualified immunity defense and, in any event, are not entitled to qualified immunity. Restrictions on prisoner speech must be justified by legitimate penological interests, which defendants make no serious effort to demonstrate. The complaint's allegations raise an inference that the individual defendants caused the retaliatory acts: they had recently crashed plaintiffs'

9

debate class, discouraging plaintiffs from contacting Illinois legislators and threatening to transfer plaintiffs away from their families to second-rate prisons.

That leaves the individual defendants' argument that the deprivations inflicted upon plaintiffs failed to deter them from engaging in First Amendment-protected activity. After all, plaintiffs continued to advocate for parole by writing to the governor and by participating in Parole Illinois. Nor did they hesitate to file grievances. But whether a deprivation is likely to deter First Amendment activity is an objective question. The alleged deprivation must be likely to "deter a person of ordinary firmness"; it need not deter plaintiffs themselves. See Bridges, 557 F.3d at 552 (7th Cir. 2009) (reversing the dismissal of a plaintiff's First Amendment retaliation claim and holding that delayed mail, disrupted sleep, and unjustified disciplinary charges "would deter a person of ordinary firmness"). The deprivations to which plaintiffs allegedly were subjected—unjustified searches, discipline, solitary confinement, and interference with phone and mail—are more than enough to deter a person of ordinary firmness from exercising his rights under the First Amendment.

### 3 Conspiracy

Defendants also move to dismiss plaintiffs' conspiracy claims. They argue that: (1) plaintiffs fail to state conspiracy claims; (2) plaintiffs' conspiracy claims are unnecessary because all the defendants are public employees; and (3) plaintiffs' conspiracy claims are barred by the intracorporate conspiracy doctrine.

#### 3.1 Failure to state a claim

Prison officials may not conspire to deprive prisoners of their constitutional rights. Hill v. Shobe, 93 F.3d 418, 422 (7th Cir. 1996). To state a conspiracy claim, plaintiffs must "allege the

parties, the general purpose, and the approximate date of the conspiracy." Loubser v. Thacker, 440 F.3d 439, 443 (7th Cir. 2006).

Plaintiffs have done just that. They state conspiracy claims against Taylor, Williams, Nicholson, and Hardy. The parties to the alleged conspiracy are the individual defendants—Taylor, Williams, Nicholson, and Hardy. They allegedly sought to deprive plaintiffs of their First Amendment rights by canceling their debate class and by subjecting them to sundry custodial humiliations—searches, seizures, discipline, solitary confinement, and interference with phone and mail, all allegedly without justification. And the individual defendants allegedly did all this from March 21, 2018, through at least June 2018. These allegations state a conspiracy claim. See id. (reversing the dismissal of a section 1983 conspiracy claim, reasoning that, "The parties to the conspiracy are clearly identified; the conspiracy is alleged to have begun in August of 2001 and to have continued for at least three years; and its purpose—to deprive the plaintiff of her property . . . is clearly if repetitiously stated as well."); Swanson v. Citibank, N.A., 614 F.3d 400, 406 (7th Cir. 2010) (reversing the dismissal of a race discrimination claim, reasoning that the plaintiff "identifie[d] the type of discrimination that she thinks occurs . . . by whom . . . and when," which was "all that she needed to put in the complaint").

Plaintiffs' allegations are admittedly imprecise. But their allegations appear to be "commensurate with the amount of information available" to them. Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana, 786 F.3d 510, 528 (7th Cir. 2015) (citation and quotation marks omitted). Plaintiffs need not allege which defendant said what and when they said it. Alleging a pattern of unjustified harassment that started after they engaged in an activity protected by the First Amendment is enough to give defendants fair notice of the grounds on which plaintiffs' conspiracy claims rest. See Geinosky v. Chicago, 675 F.3d 743, 749 (7th Cir.

11

2012) (reversing the dismissal of a section 1983 conspiracy claim in which the plaintiff alleged "a pattern of harassment by several officers over a period of months," reasoning that, "It is a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy.").

### 3.2 Unnecessary because all defendants are public employees

Next, defendants argue that plaintiffs' section 1983 conspiracy claims are unnecessary because the individual defendants are all public employees. Not so. When all defendants are public employees, a conspiracy claim brought under section 1985—not section 1983—is "superfluous" and only adds "needless complexity." Fairley v. Andrews, 578 F.3d 518, 526 (7th Cir. 2009). That is because section 1985 "permit[s] recovery from a private actor who has conspired with state actors." Id. With no private actor, section 1985 has "no role to play." Scott v. Chicago, 619 F. App'x 548 (7th Cir. 2015), citing Fairley, 578 F.3d at 526.

Plaintiffs bring their conspiracy claims not under section 1985, but under section 1983. Neither Scott nor Fairley established new restrictions on section 1983. Neither held that plaintiffs may not bring concurrent claims under section 1983 for substantive wrongs and for conspiracy to commit those wrongs. And the Court of Appeals routinely affirms judgments holding defendants liable for both. See, e.g., Jones v. Chicago, 856 F.2d 985, 992–94 (7th Cir. 1988) (affirming judgments against Chicago and Chicago police officers for claims brought "under 42 U.S.C. § 1983 for false arrest, false imprisonment, intentional infliction of emotional distress, and malicious prosecution, as well as conspiracy to commit these wrongs").

### 3.3 Intracorporate conspiracy doctrine

Nor are plaintiffs' conspiracy claims barred by the intracorporate conspiracy doctrine. Under that doctrine, "managers of a corporation jointly pursuing its lawful business do not

12

become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." Travis v. Gary Community Mental Health Center, Inc., 921 F.2d 108, 110 (7th Cir. 1990). The doctrine applies to claims under section 1985. Id. Whether it also applies to claims under section 1983 is unsettled—a point that defendants conspicuously omit from their motion to dismiss. See Lovelace v. Gibson, No. 17 CV 1201, 2017 WL 5196641, at *7 (C.D. Ill. Nov. 9, 2017) (collecting cases).

Even if the intracorporate conspiracy doctrine could apply to conspiracy claims under section 1983, it would not do so here. Consider how judges came to recognize that doctrine as a defense to section 1985 conspiracy. Congress passed section 1985—the Ku Klux Klan Act—"to put down the Invisible Empire, whose night riders were terrorizing the newly freed blacks and their white supporters." Travis, 921 F.2d at 110. The fear was not "unilateral action," but "organized, almost society-wide resistance to emancipation and civil rights." Id. Recognizing the particular evil that Congress sought to combat, courts interpreted section 1985 consistent with common law principles of corporate liability. One of those common law principles was that when multiple corporate employees act within the scope of their employment, each acts on the corporation's behalf. Those employees cannot be liable for conspiring, for a corporation cannot conspire with itself. See id. ("Blackstone remarked that the corporation and its managers are 'considered as one person in law'. Neither the text and structure nor the background of § 1985 imply a decision to discard this understanding . . . .") (citation omitted).

Yet Travis recognized that "members of the Ku Klux Klan could not avoid liability by incorporating," for what made the Klan dangerous was that it "meddled in the business of others." Id.; see also Dombrowski v. Dowling, 459 F.2d 190, 196 (7th Cir. 1972) (Stevens, J.) ("Agents of the Klan certainly could not carry out acts of violence with impunity simply because

13

they were acting under orders from the Grand Dragon."). Unlike the proverbial firm "mind[ing] its own business," Travis, 921 F.2d at 110, defendants allegedly conspired to punish prisoners in their custody for daring to advocate for reinstating parole in Illinois. They meddled in the business of others. Their alleged wrongdoing does not reduce to "routine, collaborative business decisions that are later alleged to be discriminatory"—the kinds of business decisions that the intracorporate conspiracy doctrine was created to shield. Newsome v. James, No. 96 C 7680, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000) (holding that the decision to frame someone for murder "is not the product of routine police department decision-making").

Nor does the intracorporate conspiracy doctrine apply to conspiracies that are "part of some broader discriminatory pattern," or to conspiracies that "permeate the ranks of the organization's employees." Glover Hartman v. Board of Trustees of Community College District No. 508, Cook County, Illinois, 4 F.3d 465, 470–71 (7th Cir. 1993). That is what plaintiffs allege: a conspiracy among four prison officials to carry out numerous acts designed to punish and retaliate against plaintiffs for the content of their speech. Compare Dombrowski, 459 F.2d at 196 (7th Cir. 1972) ("[I]f the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by [section 1985]."), with Volk v. Coler, 845 F.2d 1422, 1435 (7th Cir. 1988) (holding that the intracorporate conspiracy doctrine did not bar a section 1985 conspiracy claim based on "alleged numerous acts undertaken by several defendants").

**4      Failure to intervene**

Finally, the individual defendants move to dismiss plaintiffs' claims for failure to intervene, arguing that plaintiffs' allegations fail to give "fair notice." Twombly, 550 U.S. at 555.

14

Prison officials must intervene to prevent constitutional violations that they know about and have a realistic opportunity to prevent. Gill v. Milwaukee, 850 F.3d 335, 342 (7th Cir. 2017). Plaintiffs allege that Williams, Nicholson, and Hardy silently watched as Taylor: dissuaded plaintiffs from talking to state legislators; warned plaintiffs not to sue; and implied that plaintiffs could be transferred away from their families to prisons with inferior programming.

These allegations give fair notice of plaintiffs' claims against Williams, Nicholson, and Hardy. As alleged in the complaint, they had a realistic opportunity to prevent or mitigate Taylor's retaliatory acts. They could have interrupted Taylor while she spoke or talked to plaintiffs privately after class ended. They could have told plaintiffs that they were entitled to sue, to talk to legislators, and to otherwise exercise their rights under the First Amendment without fear of retaliation. Their alleged failure to do so sustains plaintiffs' claims for failure to intervene.

Those same allegations, however, fail to give fair notice of plaintiffs' claim against Taylor. Whether plaintiffs claim that Taylor is liable for failing to intervene is unclear. Their complaint states that, "One or more of the Defendants had notice and a realistic opportunity to prevent the constitutional violations . . . ."; their response states that, "Williams, Nicholson, and Hardy were present while Defendant Taylor threatened Plaintiffs and did nothing to intervene." Assuming that plaintiffs seek to hold Taylor liable, they offer no plausible theory based on failure to intervene. Taylor allegedly was the principal bad actor, not a bystander who turned a blind eye. To the extent that plaintiffs assert a claim for failure to intervene against Taylor, it is dismissed.

There is tension between the theory that Williams, Nicholson, and Hardy failed to prevent Taylor from violating plaintiffs' constitutional rights and the theory that Williams, Nicholson, and Hardy conspired with Taylor to do so. Discovery might resolve that tension. For now, both

theories of liability survive: plaintiffs are entitled to "state as many separate claims or defenses" as they have, "regardless of consistency." Fed. R. Civ. P 8(d)(3).

## **CONCLUSION**

The court dismisses plaintiffs' failure to intervene claim against defendant Gladyse Taylor and otherwise denies defendants' motion to dismiss (Doc. 25). Defendants are directed to answer the complaint on or before October 31, 2019. This case remains set for a pre-evidentiary hearing conference on October 10, 2019, at 1:30 p.m.

**ENTER:** **October 8, 2019**

_____
**Robert W. Gettleman**
**United States District Judge**